UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JEFFREY E. RODRIGUEZ,<br><br>     Plaintiff<br><br>v.<br><br>HUNT, et. al.,<br><br>     Defendants | Case No.: 3:18-cv-00435-RCJ-WGC<br><br>**Report & Recommendation of<br>United States Magistrate Judge**<br><br>Re: ECF No. 40 |

This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 40, 40-1 to 40-11.) Plaintiff filed a response. (ECF No. 43.) Defendants filed a reply. (ECF No. 44.)

After a thorough review, it is recommended that Defendants' motion be granted.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 5.)

The court screened Plaintiff's complaint and allowed him to proceed with retaliation claims against Paul Hunt, Timothy Filson, Jo Gentry, Robert Mears and Nancy Flores. (ECF No. 4.) Defendant Jo Gentry was dismissed without prejudice under Federal Rule of Civil Procedure 4(m). (ECF No. 30.)

Plaintiff alleges that on January 8, 2017, he deposited for mailing two copies of his state-post conviction habeas petition that were due by January 12, 2017. He sought to send the petition

and exhibits with a priority mail flat-rate box using a brass slip to request that officials arrange for postage. That night, Corrections Officer Coulston came to his cell and told him that Lieutenant Hunt, who was one of the officers having final authority over brass slips, was denying Plaintiff's use of the brass slip, claiming Plaintiff would have to use stamps even though he was indigent. Hunt said an administrative regulation (AR) required a court order for Plaintiff to use a flat-rate box even though that was the only way to mail his petition and exhibits, and even though Plaintiff had used this method of mailing for two years without issue.

Coulston told Plaintiff that Hunt said he was tired of inmates not being able to pay back the cost of postage, but Plaintiff provided proof he had paid back all previous brass slips. Hunt did not care. According to the relevant AR, there is no limit to the amount of postage debt an inmate may accumulate, and a court order is required only for certified mail.

Plaintiff filed an emergency grievance explaining the nature of the time bar and the right of access to the courts, noting that Hunt should not respond because it would be a violation of policy and conflict since the grievance was about Hunt. Hunt answered the grievance anyway, and denied it. In an inmate request form (also known as a kite), Filson agreed with Hunt's application of the regulations and said no one was violating Plaintiff's rights. Plaintiff believes this conduct was in retaliation for Plaintiff's history of filing grievances and for filing a motion for summary judgment in a civil rights action that upset the administration, just a few weeks before this incident.

Hunt's actions prompted Plaintiff to immediately file a motion for an extension to file his habeas petition. He sent kites with new brass slips but they were returned without a response. He claims that Hunt was holding on to the petition and had thrown out the brass slip.

The petition ended up being mailed late, and at the time he filed his complaint he did not know if the state court would grant him equitable tolling.[1]

On January 12, 2017, Plaintiff was transferred without notice from Southern Desert Correctional Center (SDCC) to the private Core Civic Saguaro Correctional Center in Arizona, where he claims he was subject to harsher treatment. Officials said they were transferring inmates to that facility who were disruptive and dangerous, based on gang activity. Plaintiff claims he has no gang affiliations, no institutional violence and only one minor write up. His only "disruptions" were the civil rights action he mentioned previously and a grievance filed the month he was transferred. Since he met none of the transfer criteria, he believes the transfer was in retaliation for enforcing his civil rights. He claims that Nancy Flores and Robert Mears (as well as dismissed defendant Jo Gentry) were responsible for drafting the list of inmates to be transferred.

Defendants move for summary judgment, arguing: state officials cannot be sued for damages in their official capacities; Plaintiff has not set forth a claim for prospective relief against Defendants in their official capacities; Plaintiff did not exhaust his administrative remedies before filing suit; Defendants did not retaliate against Plaintiff; and Defendants are entitled to qualified immunity.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the

---

[1] Since Plaintiff did not allege actual injury. *i.e.*, that the state court rejected his petition, he was not permitted to proceed with an access to courts claim related to the untimely habeas petition. Plaintiff's exhibits demonstrate he did not suffer actual injury because the state court eventually agreed with him that the delay was due to interference by prison officials and the court considered the belated petition on the merits. (*See* ECF No. 43-1 at 59-62.)

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

      If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Rule 56(d)**

Plaintiff's response and declaration in support of his response mention that Defendants did not respond to two discovery requests until six days after they filed their motion for summary judgment; therefore, Plaintiff claims that discovery is still outstanding. (ECF No. 43-1 at 2 ¶ 3.)

"If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

"Rule 56(d) provides a 'device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence.'" *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002)). "A party seeking additional discovery under Rule 56(d) must 'explain what further discovery would reveal that is essential to justify [its] opposition to the motion[ ] for summary judgment.'" *Id*. (quoting *Program Eng'g, Inc. v. Triangle Publ'ns, Inc.*, 634 F.2d 1188, 1194 (9th Cir. 1980) (alterations original, quotations omitted).

Plaintiff does not state why he was not able to incorporate the discovery responses into his brief when he still had time to file his response after the discovery responses were served. Nor does he assert that he needed to undertake further discovery to prepare his response. Therefore, to the extent his statements can be construed as a request under Rule 56(d), the request should be denied.

**B. Background Facts**

During the time period at issue, Plaintiff was initially incarcerated at Ely State Prison (ESP), and Hunt was a night-shift lieutenant at ESP, whose duties included processing brass slips for postage that accompanied legal mail from indigent inmates. (Hunt Decl., ECF No. 40-2 ¶¶ 4-5.)

Plaintiff was transferred from ESP to SDCC in December of 2017, and was then transferred from SDCC to Saguaro Correctional Center (SCC) in Arizona (also referred to as NVB). (ECF No. 40-1 at 2.) At the time, Meares and Flores were employed by NDOC in the Offender Management Division (OMD), with duties that included arranging for the transfer of inmates from NDOC facilities to SCC. (Meares Decl., ECF No. 40-3 ¶ 4; Flores Decl., ECF No. 40-4 ¶ 4.)

**C. Exhaustion**

    **1. Standard**

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative remedies irrespective of the forms of relief sought and offered through administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The failure to exhaust administrative remedies is "'an affirmative defense the defendant must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007). "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under

Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts [in a preliminary proceeding]." *Id.*, 1168, 1170-71 (citations omitted).

Once a defendant shows that the plaintiff did not exhaust available administrative remedies, the burden shifts to the plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id*. at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)); *Draper v. Rosario,* 836 F.3d 1072, 1080 (9th Cir. 2016) (inmate plaintiff did not meet his burden when he failed to identify any actions prison staff took that impeded his ability to exhaust his administrative remedies, or otherwise explain why he failed to comply with the administrative remedies process)).

Exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm grievance, but rather, the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). "Proper exhaustion" refers to "using all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id*. (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, "[s]ection 1997e(a) requires an inmate not only to pursue every available step of the prison grievance process but also to adhere to the 'critical procedural rules' of that process." *Reyes v. Smith*, 810 F.3d 654, 657 (9th Cir. 2016) (quoting *Woodford,* 548 U.S. at 90). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007).

To reiterate, an inmate need only exhaust "available" administrative remedies. *See Ross v. Blake*, 136 S.Ct.1850, 1858 (2016). "Accordingly, an inmate is required to exhaust those, but

only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id*. at 1859 (quoting *Booth*, 532 U.S. at 738).

### 2. NDOC's Grievance Process

An inmate within NDOC must utilize the grievance process set forth in AR 740 to exhaust administrative remedies. The inmate must proceed through three levels to property exhaust administrative remedies: informal, first and second levels. AR 740 also provides a process for filing emergency grievances. If an emergency grievance is not deemed an emergency, the inmate may appeal the determination through the regular grievance process. (ECF No. 40-6 (AR 740, effective Jan. 3, 2017), ECF No. 40-7 (AR 740 effective March 7, 2017).)

### 3. Analysis

According to Defendants, Plaintiff only filed two grievances in 2017 and 2018.) Neither address the mailing of his habeas petition or his transfer to SCC. (ECF No. 40-8.)

In his complaint, Plaintiff claims to have filed an emergency grievance on the issue of his habeas petition not being mailed, but Defendants claim that NDOC records do not reflect the filing of an emergency grievance. (ECF No. 40-8; Gittere Decl., ECF No. 40-9 ¶ 8.)

#### a. Mailing of the Habeas Petition

In his response, Plaintiff submits two emergency grievances regarding the mailing of his habeas petition. He filed an emergency grievance on January 8, 2017, stating that he was told that Hunt was denying his priority mail flat-rate box because it was legal mail. He explained that it was legal mail for a writ of habeas corpus, with a deadline of January 12, 2017. It is signed as being received that same date. The response states: "Current policy does not allow any other mail

than 1st class without orders from the courts, send it 1st class." Plaintiff signed the grievance as disagreeing with the determination on
January 9, 2017. (ECF No. 43-1 at 37-38.)

     The form instructed Plaintiff that a formal grievance could be pursued if the inmate disagreed with the outcome. (*Id*. at 37.) It is unclear why this emergency grievance did not appear in Gittere's search of Plaintiff's grievance records.

     Plaintiff filed another emergency grievance on January 9, 2017, asking whether the habeas petition was sent, reiterating that the deadline was January 12, 2017. The response states: "Hunt is correct you cannot send priority/certified unless the court has ordered it per AR." He was instructed to contact the mail room for his box. Plaintiff signed the form indicating his disagreement that same day. Again, the form instructed Plaintiff that he could pursue a formal grievance in the event he disagreed with the outcome. (ECF No. 43-1 at 39.) It is also not clear why this emergency grievance did not show up in Defendants' search.

     Plaintiff acknowledges that he did not file a formal grievance on this issue. Instead, he argues that he could not wait for completion of the formal grievance process because he had to address the untimely filing of his habeas petition in state court. Plaintiff does not explain why he could not assert an argument for equitable tolling in the state court without first completing the formal grievance process. In fact, Plaintiff's own exhibits demonstrate that he did file a motion for an extension of time to file his habeas petition, but he never formally submitted it to the court. (ECF No. 43-1 at 55.) Plaintiff subsequently filed a supplemental petition asserting that good cause existed to overcome the untimeliness of his petition, arguing that the delay was due to interference by prison officials. (ECF No. 43-1 at 56.) The state court agreed with Plaintiff, and considered the belated petition on the merits. (ECF No. 43-1 at 60-61.)

10

In any event, Plaintiff did not file this *federal action* until September 10, 2018, demonstrating that he had sufficient time to complete the formal grievance process regarding the claim of retaliation regarding the mailing of his habeas petition in January of 2017.

In sum, the court finds that Plaintiff did not properly exhaust his administrative remedies as to the retaliation claim against Filson and Hunt. As Plaintiff points out, the time to grieve this issue has long since passed; therefore, instead of a dismissal of the claim without prejudice, summary judgment should be granted in favor of Hunt and Filson.

### b. Transfer to Arizona

Insofar as Plaintiff claims he was unable to grieve the issue of his transfer to Arizona because he had been transferred, Defendants state that nothing in AR 740 prevents an inmate from grieving an issue while no longer at the institution at which an alleged violation of rights occurred. In addition, they state that AR 740 provides for review by persons and institutions responsible for the issue. They contend that there is no evidence that Plaintiff attempted to use the grievance process to protest his transfer.

Plaintiff, on the other hand, states that once he was transferred, he was not permitted to file a grievance against NDOC. (ECF No. 43-1 at 12 ¶ 14.) Once he returned to NDOC, the time to file a grievance on this issue had long expired, making administrative remedies unavailable. (*Id.* ¶ 15.)

In their reply, Defendants argue that Plaintiff has provided no evidence that administrative remedies were unavailable to him once he was transferred to Arizona.

Defendants ignore Plaintiff's statement in his declaration that once he was transferred to Arizona, he was precluded from filing a grievance against NDOC. In addition, AR 740 does not describe the process for an inmate who is transferred to an out-of-state institution to grieve

something that occurred while he was housed within NDOC. AR 740 governs the grievance process *within NDOC*. Defendants have not demonstrated that Plaintiff received instructions on how to grieve issues that occurred within NDOC once he was transferred to Arizona.

The court finds Plaintiff has provided evidence that administrative remedies were unavailable to him once he was transferred to Arizona to grieve his transfer. Therefore, insofar as Meares and Flores move for summary judgment as to the retaliation claim against them on the basis that Plaintiff failed to exhaust his administrative remedies, their motion should be denied.

The court will now address the merits argument for Plaintiff's retaliation claim against Meares and Flores.

**C. Retaliation**

**1. Standard**

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of the following elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities as well as a right of meaningful access to the courts." *Id*. (citing *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

### 2. Analysis

Defendants argue that there is no evidence that Flores or Meares knew of any alleged protected conduct by Plaintiff before his transfer to Arizona. In their declarations, they each state that originally, a list of 200 inmates for transfer to Arizona was compiled (before they were with the Offender Management Division (OMD)). The list was complied based on Arizona staff advising NDOC they could accept the transfer of inmates of any security level. After the original list of 200 inmates was complied, and approximately 135 inmates from NDOC transferred there, Arizona staff notified NDOC that they had limited housing remaining for inmates in disciplinary segregation or who otherwise presented management or housing problems. Then, Meares and Flores were directed to scratch the remaining inmates from the original list and develop a new list of approximately 65 inmates for transfer to Arizona. The criteria for the new list were: that the inmates have enough time remaining on their sentence; the inmates have no court hearings scheduled or medical issues that would prevent transfer; and the inmates could be housed in general population setting with each other and with other inmates in Arizona. Meares and Flores began compiling the list by pulling a list of inmates with long-term sentences remaining to be served. Plaintiff was placed on the list of transfer to Arizona because of his life sentence and he otherwise fit the criteria discussed above. (Meares Decl., ECF No. 40-3; Flores Decl., ECF No. 40-4.)

Both Meares and Flores state that at no time did they receive a request from anyone at ESP or SDCC to transfer Plaintiff to Arizona to retaliate against him. In addition, both assert that they have any knowledge of any grievances filed by Rodriguez or any civil rights complaints filed by Plaintiff before they compiled the transfer list. (*Id.*)

Defendants have provided evidence that there is no causal connection between the decision to transfer Plaintiff and any protected conduct by Plaintiff: that they were not aware of Plaintiff filing any grievances or civil rights complaints before compiling the list that included Plaintiff. Plaintiff focuses on the initial criteria to transfer inmates to Arizona, but provides *no evidence* to create a genuine dispute of material fact as to the causation element of this claim. In other words, he has not submitted evidence to establish that Plaintiff was put on the transfer list *because of* his protected conduct.

As such, Meares and Flores are entitled to summary judgment as to the retaliation claim asserted against them.

In light of the court's conclusion, it need not reach Defendants' other arguments.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Defendants' motion for summary judgment.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: September 21, 2021

                                               _William G. Cobb_
                                               William G. Cobb
                                               United States Magistrate Judge